UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| CALLIE MAIDHOF, *et al.*, | No. C 11-04971 LB |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MITCHELL CELAYA, HARRY LEGRANDE, AND ROBERT J. BIRGENEAU, | [Re: ECF No. 44] |
| Defendants. | |

## INTRODUCTION

Plaintiffs Callie Maidhof, Zachary Miller, and Luzilda Carrillo, who were students at U.C. Berkeley, and Joshua Clover, a professor at U.C. Davis, were arrested on misdemeanor trespass charges in 2009 after they occupied Wheeler Hall on the Berkeley campus to draw attention to budget cuts, tax cuts, and other U.C. administrative issues. *See* First Amended Complaint ("FAC"), ECF No. 14, ¶¶ 3, 9-10, 13-14; Joint Statement of Undisputed Facts ("JSUF") 1 & 21, ECF No. 44-1.[1] The occupation began on December 7, 2011, and ended with the 4:35 a.m. arrests on December 11, 2011. JSUF 21. On behalf of themselves and approximately 60 other people arrested with them,

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page number at the top of the document.

Plaintiffs[2] brought this putative civil rights class action against former U.C. Berkeley Chief of Police Mitchell Celaya, Vice Chancellor for Student Affairs Harry LeGrande, and Chancellor Robert Birgeneau, claiming that their arrest violated the Fourth Amendment because the U.C. administration gave them permission to be in Wheeler Hall. *See* FAC ¶ 4. They also claimed that by detaining and transporting them to Sant Rita Jail instead of citing and releasing them on campus, Chief Celaya and Vice Chancellor LeGrande retaliated against them in violation of the First Amendment. *See* FAC ¶¶ 49-52.[3] At the time, Chief Celaya and Vice Chancellor LeGrande were members of the Berkeley campus crisis management team ("CMT"), a group of senior campus officials and administrators charged with coordinating the campus's response to urgent matters affecting the campus community, including matters that required immediate input and response from multiple departments and groups within the campus. JSUF 3. One such matter was the occupation of Wheeler Hall that led to this lawsuit. *See* JSUF 5, 7-15, 17-19.

The U.C. Defendants moved for summary judgment on both claims. *See* Motion, ECF No. 44. The court held a hearing on August 15, 2013 and now grants the motion on the Fourth Amendment claim as to all defendants, grants the motion on the First Amendment claim as to Vice Chancellor LeGrande and Chief Celaya in his official capacity, and denies the motion on the First Amendment claim as to Chief Celaya in his individual capacity.

**STATEMENT**

During the fall of 2009, a number of protests occurred on the U.C. Berkeley campus related to state budget cuts that would reduce funding to the University of California. JSUF 4. Two protests requiring a police response occurred at Wheeler Hall, one of the largest classroom buildings on campus. *Id.* First, after a September 24, 2009 rally and march addressing the budget cuts, a group of protesters briefly occupied Wheeler Hall and placed illegal locks on all but one of the exterior doors. *Id.* Second, on November 20, 2009, a group protesting the budget cuts occupied and

---

[2] The parties stipulated to the dismissal of former plaintiffs Brian Glasscock and Laura Zelko. *See* ECF No. 37.

[3] The court previously dismissed the First Amendment claim against Chancellor Birgeneau. *See* 4/5/12 Order, ECF No. 25 at 11. Plaintiffs also voluntarily dismissed their claims against UCPD Officer Marc DeCouloude. *See* ECF No. 21.

ORDER (C 11-04971 LB)                2

barricaded Wheeler Hall, a crowd of approximately 2,000 people gathered outside, and there were a number of violent confrontations between police and members of the crowd that resulted in injuries and numerous arrests. *Id.* As a result of these incidents, Wheeler Hall became a focal point for the budget-related protests on campus during this time period. *Id.*

In 2009, the University's fall term classes ended on December 4, 2009, and finals were scheduled to begin on Saturday, December 12. JSUF 6. The week before finals began – the week of December 7 – often is referred to as "study week." *Id.* Chief Celaya and Vice Chancellor LeGrande knew that during study week, classes would not be held, Wheeler Hall would remain open to the public during its normal hours, and there were review sessions and other activities scheduled to occur in Wheeler Hall. *Id.*

On Friday, December 4, 2009, Chief Celaya and Vice Chancellor LeGrande each learned that a group planned to "emancipate," "reclaim," or occupy Wheeler Hall during the week of December 7, 2009. JSUF 5. On Monday, December 7, 2009, a group of protesters gathered at Wheeler Hall, hung banners and posters on the building's exterior and interior, set up an information table in the building's lobby, and, without authorization, scheduled a guest speaker to address a gathering in Wheeler Auditorium. JSUF 7. The protesters referred to their occupation as "Live Week" and "Open University." They announced that they intended to occupy Wheeler Hall around the clock, for the entire week of December 7, 24 hours per day. JSUF 8.

On the afternoon and evening of December 7, 2009, CMT members met regarding the campus's initial response to the unauthorized occupation of Wheeler Hall. JSUF 9. The CMT was informed that Cal Performances, which managed Wheeler Auditorium, had expressed concerns to U.C. Berkeley Police Department ("UCPD") about the unauthorized use of the space and the use of their equipment by the protesters. *Id.* Chief Celaya and Vice Chancellor LeGrande each participated in these discussions. *Id.*

On Monday evening, December 7, UCPD officers asked the protesters to vacate Wheeler Auditorium. JSUF 10. A large number of protestors disregarded UCPD's request. *Id.* After the request, there was at least one social media post by a protestor urging others to come and join them inside Wheeler. *Id.* There were reports that the protesters had supplies of food and were settling in

ORDER (C 11-04971 LB)                                3

for a long stay. *Id.* In response to these developments, the CMT decided to wait until the building closed to the public for the night and then give formal dispersal admonishments to those who remained. *Id.*

On Monday night, December 7, after Wheeler Hall's 10 p.m. closing time, UCPD officers gave dispersal admonishments at multiple locations within Wheeler Hall. JSUF 11. The admonishments, which were videotaped, advised those present that Wheeler Hall was closed for the night and that by remaining in Wheeler Hall, they were subject to administrative and criminal penalties. *Id.*

A large number of protesters disregarded the admonishments. JSUF 12. The parties agree that those individuals who disregarded the admonishments and remained at Wheeler Hall after it closed did so without authorization and in violation of University rules and criminal trespass laws. JSUF 11.

On Tuesday December 8, the CMT discussed the ongoing events at Wheeler Hall. JSUF 13. "[T]he decision was made for UCPD to continue to give dispersal orders." *Id.*

According to Plaintiff Zachary Miller, UCPD Lieutenant DeCoulode told him that the University was "prepared to informally sanction this event given that you are out by – that you not disrupt the final on Saturday morning, whatsoever, and you are completely cleared out between now and then and that you continue to maintain the proper use of the space . . . ." Miller Dep. 134:22-135:13, Satterlund Decl. Ex. A, ECF No. 51-1 at 13-14.[4] Mr. Miller says that he passed Lieutenant DeCoulode's comments on to the group. Satterlund Decl. Ex. A, ECF No. 51-1 at 15-16. At 9:39 p.m. on December 8, CMT member Amanda Carlton sent Chief Celaya and Vice Chancellor LeGrande an e-mail telling them that "ucbprotest" posted the following twitter "about an hour ago":

---

[4] Miller testified that this conversation took place on the morning of December 9, 2009. *See* Miller Dep., Satterlund Decl. Ex. A. The parties agree that Miller is wrong about the time because Lieutenant DeCoulode was out of the state on December 9th and did not return until after the arrests. *See* Opp'n, ECF No. 53 at 9 n.2. Instead, Plaintiffs cross-reference other evidence about the timing of the conversation and ask the court to assume that the conversation took place on the evening of December 8th. *Id.* Defendants argue that the discrepancy calls into question Miller's credibility, particularly given that he testified that he recalled the conversation "very clearly." *See* Motion, ECF No. 44 at 21; Reply, ECF No. 7 at 19. Officer DeCoulode does not remember the details of his conversation with Mr. Miller but agrees that he "likely spoke" with him. DeCoulode Dep., Satterlund Decl Ex. J, ECF No. 51-1 at 82-83.

ORDER (C 11-04971 LB)                              4

"The UC Berkeley administration has given us Wheeler Hall through Friday. We've won, now let's party." Satterlund Decl. Ex. K, ECF No. 51-1 at 88.[5]

On Tuesday night, December 8, UCPD officers gave dispersal admonishments to those present at multiple locations within Wheeler Hall shortly after its 10 p.m. closing time. JSUF 14. The admonishments advised that Wheeler Hall was closed for the night and those who remained were subject to administrative and criminal penalties. *Id.* At 11:53 p.m., Chief Celaya sent an e-mail to several other UCPD officers including Marc Decoulode. *See* Satterlund Decl. Ex. I, ECF No. 51-1 at 79. In relevant parts, the e-mail stated:

> It has been decided that our response to the Wheeler Hall study-in will continue to be the following:
>
> - monitor & document any violations of campus rules & laws
>
> - video the admonishments regarding building closure, request for individuals to leave, and make clear the possible SJA & criminal consequences.
>
> - write up & send reports to SJA for review & action.
>
> The chancellor is firm on there being consequences for the students' behavior & actions. This includes restitution for damages and costs incurred. . . . It is also critically important that we get good video to identify student & nonstudents (we will need to discuss how to proceed w/the nonstudents).
>
> . . .
>
> If there is a line to be drawn it will be on Friday as finals begin on Saturday in Wheeler. I believe the protestors will not attempt to interfere or disrupt these activities but we may need to have increased presence to ensure students leave Wheeler before finals begin.
>
> . . .
>
> I will be in on Thursday and will ask that we have a senior staff meeting to review this direction & plan.

*Id.*

On Wednesday afternoon, December 9, 2009, the CMT members learned that the Live Week protesters were planning to hold a hip-hop concert inside Wheeler Hall that Friday night, December 11. JSUF 15. When they learned about the concert, CMT members became concerned that (1) it

---

[5] The court considers this e-mail for its effect on the recipients and for the fact it was said, and not for the truth of the matter asserted in it. *See* Reply, ECF No. 64 at 6 n.3 (raising an objection on hearsay grounds).

was unauthorized and would bring an unknown number of students and outsiders into Wheeler Hall on Friday night, (2) there would be inadequate security and other controls, and (3) the concert might disrupt final examinations, which were scheduled to begin at Wheeler Hall at 8:00 a.m., Saturday, December 12, the morning after the concert. *Id.*

On Wednesday night, UCPD officers gave dispersal admonishments shortly after the 10 p.m. closing time at multiple locations to those who remained in Wheeler Hall. JSUF 16. *Id.* The admonishments advised those present that Wheeler Hall was closed for the night and that by remaining in Wheeler Hall, they were subject to administrative and criminal penalties. *Id.*

Early Thursday morning, December 10, 2009, Associate Vice Chancellor of Public Affairs Claire Holmes alerted CMT members to a Facebook posting that promoted the concert at "Liberated Wheeler Hall." JSUF 17. The posting indicated the concert would last all night long and listed an "end time" of 5:00 a.m. Saturday morning. *Id.* The Facebook page promoting the concert had a picture of a promotional flyer referring to the concert as an "all night dance party" lasting "8pm till the cops kick in the doors." *Id.* Later on Thursday, the CMT convened by telephone and discussed the status of the Wheeler Hall occupation and specifically the protestors' plans to hold a concert. *Id.*

UCPD completed an Operational Plan to arrest individuals who remained overnight at Wheeler Hall on Thursday night. JSUF 18. Defendant Celaya reviewed and approved the Operational Plan on Thursday night. *Id.* The Operational Plan provided the following:

A sergeant and the civilian booking team will secure room 20 in the basement to use the holding room. Booking will be done in the west basement hallway.

The arrest squad will break up into teams as necessary to contain & arrest people remaining in the building. The first priority is to secure cell phones & palmtop/laptop computers without getting into physical fights. Once we have restricted outgoing communications, we will systematically arrest violators.

All arrestees will be moved to the booking area and processed. All arrestees will be held until all processing has been completed. They will then be released as a group at the N/W basement doors. The cell phones and computers will be returned at that time. All arrestees that were arrested on November 18 at the A&E building and/or on November 20th at Wheeler Hall will be transported immediately to Santa Rita and not booked on site. All other arrestees will be cited for release unless that is not legally possible.

**ARREST PROTOCOL:**
Officers will intervene and take police action for those situations where there is an imminent threat to life or possible bodily injury. Otherwise, police officers are not to take action

independent from their teams.

. . . .

Celaya Decl. Ex. A, ECF No. 46-1.  The UCPD's general order regarding booking procedures for mass arrest booking implements California Penal Code § 853.6, which sets forth cite-and-release procedures for misdemeanors.  Satterlund Decl. Ex. A, ECF No. 53-1.  The general order provides in relevant part:

> Misdemeanor citations <u>shall</u> be used in lieu of physical arrest and incarceration unless the subject is ineligible as provided in Section 856.6(j) of the California Penal Code.  Every effort should be made for field citation and release.

*Id.*

On Thursday, December 10, 2013, Associate Dean of Students Christina Gonzales and Amanda Carlton from Campus Life and Leadership met with Plaintiff Zachary Miller to discuss the protestors' plan to hold the all-night concert on Friday, December 11.  JSUF 19.  Gonzales and Carlton discussed the campus's concerns with permitting the concert at Wheeler Hall, including the start of final examinations on Saturday, December 12, "the unauthorized nature of the event, the unpaid cost of the event, security for the concert, the attendance of non-affiliates, the lack of liability insurance, and potential property damage to Wheeler Hall."  *Id.*  Gonzales and Carlton reported to CMT members on Thursday that "the protestors had refused to change their plans to hold the concert at Wheeler Hall."  JSUF 19.

On Thursday night, December 10, UCPD officers gave dispersal admonishments at multiple locations within Wheeler Hall, commencing shortly after its 10 p.m. closing time.  JSUF 20.  The admonishments advised those present that Wheeler Hall was closed for the night and that they were subject to administrative and criminal penalties by remaining there.  *Id.*

At approximately 4:35 a.m. on December 11, UCPD officers entered Wheeler Hall.  JSUF 21.  The officers encountered a large number of people who apparently had spent the night and were asleep or just waking up.  *Id.*  The officers then arrested 65 people (the putative class and the named plaintiffs) inside Wheeler for trespass.  *Id.*  One more person was arrested outside Wheeler Hall for interfering with a peace officer.  *Id.*  Defendant Celaya was present at Wheeler Hall throughout the operation.  *Id.*  Defendant LeGrande was not present at Wheeler Hall at any time during the arrests.

*Id.* At the time of the arrests, each Plaintiff was aware that dispersal orders had been given to those present in Wheeler Hall the previous night. JSUF 22.

Pursuant to the Operational Plan, the arrestees were moved to a booking area that was set up in the basement of Wheeler. JSUF 23. Approximately a dozen arrestees, including Plaintiff Callie Maidhof, were sent directly to Santa Rita Jail. JSUF 25. At the time, Chief Celaya understood that these people had been arrested within the past month while occupying Wheeler Hall or the Arts and Engineering Building. *Id.* The Operational Plan called for these arrestees to be transported to Santa Rita Jail, and so they were. *Id.* According to Chief Celaya, he approved the Operation Plan because he "understood that transport to Santa Rita of these prior arrestees was called for because UCPD did not have the resources in the field to determine whether these individuals had violated any existing conditions of release imposed on them at the time of their prior arrests and, if so, whether additional processing and/or detention might be warranted." Celaya Decl., ECF No. 46, ¶ 22.

The Operational Plan called for the rest of the arrestees to be cited for misdemeanor trespass and released directly from Wheeler Hall. JSUF 25. Instead, Chief Celaya decided to transport these arrestees to Santa Rita Jail. *See* JSUF 24. He directed Lieutenant Tejada to take immediate steps to transport all of the arrestees to Santa Rita Jail to be booked, cited, and released. *Id.* The booking operation underway at Wheeler was stopped and buses were brought in from the Alameda County Sheriff's Office ("ACSO"). *Id.* The arrestees, including Plaintiffs Miller, Carillo, and Clover, were taken to Santa Rita Jail on the ACSO buses. JSUF 24, 26. All but a few of these arrestees were then cited and released. JSUF 24.

Defendant LeGrande did not participate in the decision to transport any of the arrestees to Santa Rita Jail and learned of it only after they had already been taken there. JSUF 27.

According to Chief Celaya, the reason that he decided to take the arrestees to Santa Rita instead of citing and releasing them on site is as follows. As the on-site booking operation got underway,[6] he became concerned with the large number of individuals who needed to be processed and the amount of time it would take to complete the operation. *Id.* ¶ 20. Some of the arrestees were non-

---

[6] Celaya was present at Wheeler Hall throughout the operation. Celaya Decl., ECF No. 46, ¶ 19. Wheeler remained closed to the public until 7 a.m.

ORDER (C 11-04971 LB) 8

affiliates, meaning, they were not students or otherwise affiliated with the University, and "required additional procedures and extra processing time." *Id.* Chief Celaya concluded that the UCPD did not have the resources on hand at Wheeler to process these and the other arrestees in an efficient or timely manner. *Id.* He was aware that social media posts had gone out encouraging students to gather at Wheeler in support of the arrestees, and protestors had started to arrive. *Id.* He also was concerned about the potential for a repeat of the events of November 20, when a large group gathered outside Wheeler while the building was barricaded and occupied by a group protesting the budget cuts. *Id.* That group was agitated and volatile. *Id.*; *see* JSUF 4 (violent confrontations between police and crowd members resulted in injuries and numerous arrests). Chief Celaya wanted to avoid similar incidents and decided that "the best course was to remove the arrestees from the scene before processing was completed, while it was still early in the day and before any large crowd could form." Celaya Decl. ¶ 22. He "also wanted to ensure that Wheeler was cleared and accessible as soon as possible in order to ready it for finals the next morning." *Id.*

According to Plaintiffs, Chief Celaya's decision was made at 6:33 a.m. Opposition, ECF No. 53 at 14. No arrestees were cited and released before this decision. *Id.* Plaintiffs also argue that on November 20, 2013, the UCPD – with "an angry crowd of thousands outside Wheeler Hall – cited and released 40 arrestees there within three hours. *Id.* at 26.[7]

At 11:48 a.m. December 11, in response to a 10 a.m. e-mail from CMT member Dan Mogulof's e-mail regarding a tweet that announced plans for a noon rally at Cal Hall, Chief Celaya sent an e-mail to the CMT that included this section:

Chief Update:

As Captain Bennett mentioned we will have a team of officers monitor the proposed rally at 11:30 a.m. The good news is that the arrested protestors are still at Santa Rita getting booked so they won't be able to participate in the rally.

Satterlund Decl. Ex. HH, ECF No. 51-3.

In an e-mail on May 3, 2010, titled "Student Conduct Related Issues," Vice Chancellor LeGrande announced that the University "would not pursue student conduct actions" against the students who

---

[7] Plaintiffs cite to the DeCoulode Deposition for this quotation but did not provide the cited portion. *See* DeCoulode Dep., Satterlund Decl. Ex. J, ECF No. 51-1 at 81.

occupied Wheeler Hall, in part because of "the genuine confusion on the part of some students regarding dispersal orders." Satterlund Decl. Ex. DD, ECF No. 51-3 at 2.

## ANALYSIS

### I. THE CLAIMS

In this section 1983 case, Plaintiffs claim that the U.C. Defendants – Chief Celaya and Vice Chancellor LeGrande in their individual and official capacities and Chancellor Birgeneau in his official capacity – violated their Fourth Amendment rights by arresting them for trespass because the University licensed Plaintiffs' occupation and never told them the license was rescinded. *See* FAC, ECF No. 14, ¶¶ 55-59. Put another way, it was not trespass because they had permission. They also claim that Chief Celaya and Vice Chancellor LeGrande in their individual and official capacities violated Plaintiffs' First Amendment rights because – in order to punish them for exercising their free speech rights – they bussed them to Santa Rita Jail for processing instead of citing and releasing them on campus. *Id.* ¶¶ 49-52.

To prevail under § 1983, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The parties do not dispute that the defendants are state actors, and the issue is whether their conduct violated the Fourth and First Amendments.

### II. THE SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party, which must go beyond the pleadings and submit admissible evidence supporting its claims or defenses and showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Nissan Fire*, 210 F.3d at 1103; *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. PLAINTIFFS' FOURTH AMENDMENT CLAIM

The Fourth Amendment to the United States Constitution protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. It is undisputed that Plaintiffs were arrested within the meaning of the Fourth Amendment. The issue is whether their arrest for trespass was without probable cause in violation of the Fourth Amendment because they had permission to be at Wheeler Hall.

California Penal Code § 602(q) defines misdemeanor trespass as:

> Refusing or failing to leave a public building of a public agency during those hours of the day or night when the building is regularly closed to the public upon being requested to do so by a regularly employed guard, watchperson, or custodian of the public agency owning or maintaining the building or property, if the surrounding circumstances would indicate to a reasonable person that the person has no apparent lawful business to pursue.

Cal. Penal Code § 602(q) (2011).

The misdemeanor arrests here required probable cause that Plaintiffs violated section 602. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause to conduct a warrantless arrest exists when the police have, at the moment of the arrest, "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck*, 379 U.S. at 91). Probable cause is a "practical, nontechnical conception" based on a "common-sense conclusion about human behavior, " and it is a "fluid consent – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983) (internal citations and quotations omitted). Its existence is determined under the totality of the circumstances. *Id.* at 238; *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

The probable cause determination has two steps. First, the court considers the historical facts, meaning, the events that occurred leading up to the arrest. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Second, the court considers whether these facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Id.*; *see Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (the objective standard means that the arresting officers' subjective intentions are irrelevant to the existence of probable cause). The "evidence supporting probable cause need not be admissible in court, but it must be 'legally sufficient and reliable.'" *Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 (9th Cir. 2013) (quoting *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002)).

Defendants argue that the following facts show probable cause:

- Wheeler Hall closed at 10 p.m. on Thursday, December 10, 2009;
- After the building closed, UCPD Officers gave dispersal admonishments to those present;
- The dispersal announcements indicated that those who remained in Wheeler Hall were subject to University disciplinary proceedings and criminal prosecutions;
- A large number of people disregarded the dispersal announcements; and
- When officers entered Wheeler Hall at 4:35 a.m. on December 11, they encountered a large number of people "who had apparently spend the night, and were asleep or just waking up."

*See* JSUF 7-20. These facts are sufficient for Defendants to show probable cause of trespass.

The burden then shifts to Plaintiffs to submit admissible evidence showing a genuine dispute of material fact. *See Celotex*, 477 U.S. at 324. Their argument is permission: the University gave Plaintiffs a license to remain in Wheeler Hall until Friday and Chief Celaya knew of this "license agreement." *See* Opp'n, ECF No. 53 at 17-18.

The problem is that the facts do not show permission. They show that the administration decided to continue to give dispersal orders each night that week after Wheeler closed at 10 p.m. *See, e.g.,* JSUF 13-14, 16, 20. They planned to continue monitoring and documenting violations of campus rules. Celaya 12/8/09 e-mail, Ex. I, Satterlund Decl., ECF No. 51-1 at 79. They knew that at least someone twittered that "[t]he UC Berkeley administration has given us Wheeler Hall through Friday. We've won, now let's party." *Id.*, Ex. K. The facts in the statement show only that the University planned to continue monitoring and that the "firm line" was to make sure that the activities did not disrupt finals on Saturday, December 12. *See supra* at 4-5. Indeed, Chief Celaya said on Tuesday, December 8, that he would be in on Thursday and "will ask that we have a senior staff meeting to review this direction & plan." *See* Ex. I to Satterlund Decl., ECF No. 51-1 at 79.

The facts thus show only tolerance and monitoring of the situation, not a license or permission. And as the week progressed, circumstances changed. By Wednesday and Thursday, December 9 and 10, CMT members learned of the occupiers' plan to host an all-night dance party the night before finals started "from 8pm till the cops kick in the door," and they convened to address their concerns about security and disruption. JSUF 15, 17. On Thursday, December 10, Associate Dean Christina Gonzales and Amanda Carlton from Campus Life met with Mr. Miller, asked the protestors to change their plans, and reported back to CMT that the protestors refused. JSUF 19. By Thursday night, Chief Celaya approved the Operation Plan for the arrest. JSUF 18. That night, UCPD officers gave the standard admonishments to disperse and notice of the consequences (including the possibility of criminal charges). JSUF 20. It is undisputed that Plaintiffs were aware of the dispersal orders (even though that is not necessarily relevant to probable cause). JSUF 22. Under the totality of the circumstances at the time of the arrests, there was probable cause of trespass.

Even if these facts did not establish probable cause, the court would find qualified immunity for both Chief Celaya and Vice Chancellor LeGrande. Under the second prong of the two-prong inquiry in *Saucier v. Katz*, 533 U.S. 194 (2001), it at least is "*reasonably arguable* that there was probable cause for arrest" on the trespass charge, meaning, "reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011). Put another way, if the facts here do not establish probable cause, that legal conclusion was not clearly established at the time of the arrest, and they are entitled to qualified immunity.

Moreover, the Fourth Amendment claim against Vice Chancellor LeGrande is based solely on his position on the CMT. *See* FAC, ECF No. 14 at 11. His role is too attenuated to support any conclusion that he was personally involved in the constitutional deprivation, set in motion a set of acts that he knew (or reasonably should have known) would cause others to inflict constitutional injury, knew of the violations and failed to prevent them, or engaged in any wrongful conduct with a sufficient causal connection to the alleged constitutional wrong. *See Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir. 1995), *overruled on another ground in Ferguson v. City of Charleston*, 532 U.S. 67 (2001), and *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

The uncontradicted evidence shows that Vice Chancellor LeGrande did not know the arrests would be unconstitutional. As he explains in his declaration:

> I at all times understood that neither the CMT nor the campus administration had authorized any overnight occupation of Wheeler Hall, and that any individuals who disregarded admonishments to disperse were subject to arrest and/or disciplinary proceedings. This remained true throughout the remainder of the week of December 7.

LeGrande Decl., ECF No. 47, ¶ 12. He also states that when the CMT decided to enforce the dispersal orders on December 11, he "understood that . . . UCPD would proceed with preparations to clear Wheeler Hall and/or arrest those individuals who disregarded dispersal admonitions to leave Wheeler Hall on Thursday night." *Id.* ¶ 15. Nothing here shows that LeGrande had a basis to believe that the arrests would have been unconstitutional.

ORDER (C 11-04971 LB)                      14

Plaintiffs' evidence does not contradict this conclusion.  They point to the December 8, 2009 e-mail from Amanda Carlton quoting a tweet from "ucbprotest" that "The UC Berkeley administration has given us Wheeler Hall through Friday.  We've won, now let's party."  Satterlund Decl. Ex. K, ECF No. 51-1 at 88.  But this tweet – which is hearsay for the truth of the matter asserted – is not evidence that Vice Chancellor LeGrande knew Plaintiffs reasonably believed they were licensed on December 11 given the intervening dispersal orders.  Nor does it alter a record that shows a course of tolerance and monitoring, a firm line drawn around the start of finals on Saturday, December 12, the changed circumstances of the all-night party on Friday, December 11, and a pattern of nightly dispersal orders through and including December 10.  And Vice Chancellor LeGrande's May 3, 2010 e-mail, which announced that the University would not pursue student conduct actions against the occupiers because of "the genuine confusion on the part of some students regarding dispersal orders," is not evidence that the Vice Chancellor knew of any license when Plaintiffs were arrested.  *See* Satterlund Decl. Ex. DD, ECF No. 51-3 at 2.[8]

## IV. PLAINTIFFS' FIRST AMENDMENT CLAIMS

To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) the defendant's action "would chill or silence a person of ordinary firmness from future First Amendment activities" and (2) the defendant's "desire to cause the chilling effect was a but for cause of the defendant's action."  *Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (internal quotation marks and citation omitted); *see also Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013).

The issue here is whether sending Plaintiffs to Sant Rita Jail instead of citing and releasing them under the Operation Plan and California Penal Code § 853.6 was in retaliation for or to chill Plaintiffs' exercise of their First Amendment rights.

On this record, as to Chief Celaya, there are issues of fact that preclude summary judgment.  The general order and the operations plan point to a policy of cite-and-release that is consistent with

---

[8] The Fourth Amendment claim also was against the U.C. Defendants in their official capacities.  Plaintiffs do not seek injunctive or declaratory relief, the Eleventh Amendment bars all other remedies, and Plaintiffs did not argue any theory or oppose the motion for summary judgment on this ground.  *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997); *Ex Parte Young*, 209 U.S. 123 (1908).

ORDER (C 11-04971 LB)     15

California Penal Code § 853.6. *See supra* at 6-7. According to Plaintiffs, there was a two-hour delay between entry and decision (and Chief Celaya's own declaration puts him there from entry at 4:35 a.m.). *See supra* at 8-9. Another mass arrest on November 20 was processed in three hours. *See supra* at 9. Chief Celaya offers his explanation, *see supra* at 8-9, and the court understands the point made at the hearing that he had to have made the decision at the scene given that the buses were called in that morning. Still, the trier of fact can best assess the explanation in the context of the entire record (including Chief Celaya's e-mail that the "good news is that the arrested protestors are at Santa Rita getting booked so that they won't be able to participate in the rally"). *See* Satterlund Decl. Ex. HH, ECF No. 51-3. The court also appreciates that Defendants point to other e-mails that they argue show Chief Celaya's accommodation of the protestors, *see* Reply, ECF No. 64 at 12-13, but Plaintiffs cite other emails that they assert show his antagonism, *see* Opposition, ECF No. 53 at 23. It is a close call, but these issues of fact and credibility preclude summary judgment. In sum, when taken in the light most favorable to Plaintiffs, reasonable inferences from the cited e-mails and Chief Celaya's actions could be sufficient evidence of retaliatory intent.[9]

Nor is Chief Celaya entitled to qualified immunity. As the Ninth Circuit recently explained in *Ford*, by 2007, "a reasonable police officer would have understood that he could not exercise his discretion to book an individual in retaliation for that individual's First Amendment activity." 706 F.3d at 1196 (analyzing the import of precedent including *Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008); *Skoog*, 469 F.3d at 1221; & *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)).

As to Vice Chancellor LeGrande, it is undisputed that he "did not participate in the decision to transport any of the arrestees to Santa Rita Jail" and was not aware of it until afterward. JSUF 27. Plaintiffs provide no contradictory evidence to establish causation. Accordingly, the court grants

---

[9] The court's ruling applies equally to claims of those Plaintiffs (including Ms. Maidhof) who were sent immediately to Santa Rita under the Operation Plan because of their prior arrests. On this record, there is no basis for distinguishing between the two groups.

ORDER (C 11-04971 LB)  16

summary judgement in his favor on the First Amendment claim.[10]

## CONCLUSION

The court grants summary judgment in favor of the defendants on all claims except the First Amendment claim against Chief Celaya in his individual capacity.[11]

This disposes of ECF No. 44.

**IT IS SO ORDERED.**

Dated: August 15, 2013

_____
LAUREL BEELER
United States Magistrate Judge

---

[10] To the extent that Plaintiffs sue the U.C. Defendants in their official capacities on the First Amendment claim, the court grants summary judgment in the defendants' favor. Moreover, under *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983), and its progeny, Plaintiffs do not have standing to seek injunctive relief because they allege only a hypothetical threat of future injury. Plaintiffs' reliance on *Thomas v. City of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) does not change this outcome. There, the Ninth Circuit held that minority residents of a neighborhood alleged a real and immediate threat from local police. They presented evidence of repeated, ongoing, unlawful searches and seizures, including retaliatory attacks stemming from the lawsuit itself. *Id.* Plaintiffs here do not establish such a real and imminent threat and instead show one isolated incident.

[11] As to Defendants' remaining hearsay objections to Plaintiffs' exhibits, the court either did not rely on the evidence or did not consider them for the truth, and the exhibits in any event would not have changed the outcome here.

ORDER (C 11-04971 LB)                    17